# LORI WILLIAMS V CITY OF LANSING

Case No. 1:10-cv-1028

Exhibit 1 – Executive Summary of Internal Affairs Investigation



# LANSING POLICE DEPARTMENT
## PATROL DIVISION



## MEMORANDUM

| TO | Chief Szymanski |
| --- | --- |
| FROM | Captain Mike Yankowski |
| DATE | November 26, 2010 |
| RE | IA08-0006/ Executive Summary |

### Executive Summary-

- On May 24, 2007, the initial complaint evolved from a Lansing Police Department Special Operations Section (SOS) drug investigation of Robert Lincoln Crews. SOS seized ½ kilogram of Cocaine, Marijuana and (2) handguns from Crews residence of 113 E. North St, see LLA070524035330. Robert Crews was arrested (July 2007) and interviewed on August 15, 2007 with his attorney Hugh Clarke, (see Todd Johnson SOS report.)

- During the May 24, 2007 responding Patrol Officer Penni Glynn Elton further reported a suspicious call during the contraband seizure at Crews home. Ofc. Glynn Elton was securing the residence for a SOS search warrant when Williams called her. Williams was off-duty at the time of the seizure, but questioned Glynn Elton why officers were in the neighborhood of North St.

- Glynn Elton describes her relationship with Williams as coworker and acquaintance. Williams had not called her before and Glynn Elton noted the call as strange. Glynn Elton explained that as coworkers the shift exchanged telephone numbers and that was the only reason why Williams had her number. Williams was not on duty and Glynn Elton was confused about the telephone call.

- Williams states that Penni informed her that officers had seized drugs and guns from a house on North St (LPD LLA070524035330). Williams reports the following dialogue with Crews "*I said well it's it's not nothing to do with you can go home because that was the impression I had like he wanted to get to his house.*" Williams further mentioned to Crews that police were completing a raid and he would be allowed to return to his residence. Williams said that Crews' response to the information was vague and unclear.

- Glynn Elton does not get routine telephone calls from Williams and was confused why Williams was inquiring about this neighborhood. As a result, Glynn Elton expressed her concerns to SOS Sergeant Todd Johnson

1

- SOS further discovered that Williams had contacted Crews via telephone within the same proximate time that LPD Officers were at Crews' house. Telephone logs show that Williams returned another call to Crews after speaking with Officer Penni Glynn Elton. There was a suspicion that Officer Williams possibly leaked sensitive police information about the drug and gun seizure. As a result of the telephone call it was believed that Crews who was going to be arrested, did not approach the residence. SOS contacted Internal Affairs about the situation.

- Williams recalls that Crews called her on this date. Crews then inquired why the police were in his neighborhood. Williams argues that Crews portrayed that he merely wanted to understand why the streets were blocked and asked when he would be able to enter his home. As a result, Williams said that she called Penni Glynn Elton to inquire. Williams conferred that she and Penni Glynn Elton were not close friends but on a few occasions when working the same shift they would eat lunch together.

- It was further ascertained that Crews and Williams communicated often and spent time together while Williams was on and off duty.

- Williams admitted that she sought a financial loan from Crews when she needed money to purchase her son's school clothes. Crews loaned Williams $300 or $350 and there was no contractual agreement reference repayment. Williams reports that she fulfilled the obligation on unknown date. Williams also stated that she did not know if Crews was employed at the time of this loan. This loan took place either in 2006 or 2007. Williams reports that she borrowed $300 - $350 from Crews approximately one year before the May 24, 2007 drug seizure.

- Officer Williams association with reputed drug dealer Robert Lincoln Crews. Crews has an extensive criminal history with involvement in drug trafficking, felony gun possession, retail fraud, domestic violence and other criminal activities. Williams commented that the two then *"started a friendship"* sometime in *"2002 or 2003."* The two talk periodically and have been spent time together.

- Williams has visited Crews' house two times, both of which she was on duty and driving a fully marked patrol unit. Crews formerly resided at 113 E. North St at the time of Williams' visits. Williams does not recall the dates of her attendance but is confident that her visits to Crews' home were before the May 24, 2007 incident. During this occurrence ½ kilograms of cocaine, marijuana and 2 handguns (LLA070524035330) were seized from the residence.

- Williams estimates that her communication with Crews ceased soon after the May 24th 2007 drug investigation. Williams explained her reasoning for ceasing communication with Crews; *"Like me and him stopped like once kind of all this started blowing up or whatever and I'm kind of like it's not worth it to me to be dealing with him like I said at the time I knew that I wasn't like I knew I shouldn't have been handing around him and talking to him but I wasn't involved in any*

2

*sort of criminal activity with this kid or anybody else but it kind of got to the point where okay people at my job are looking at me funny."*

- Williams was questioned concerning court testimony that her relationship with Crews progressed from a friendship to one of which Crews became her confidential informant. Williams cannot recall the approximate or exact date when Crews' status changed. Williams told no one at LPD of her relationship with Robert Crews. Williams has not been trained on the legal and ethical management of confidential informants. Williams states that her definition of a confidential informant is a person whose identity is protected while they provide police related information.

- Williams was unable to provide a time line concerning Crews' status as a friend and then as a confidential informant. Williams was asked again reference a time frame when Crews became her confidential informant. Williams repeated that she was unsure of a date, Williams exclaimed "If would be late 2007 because like I said at that time we stopped talking maybe 2008, early 2008.

- Williams admitted that she has checked Crews in LEIN and the LPD IIQ, RMS and Offender track data base systems. IIQ, RMS and Offender track are used by LPD officers and non-sworn personnel. These databases give LPD employees and other agencies on our network full access to most police reports completed by LPD employees. The databases would demonstrate the number and types of police contacts a citizen had with the LPD. Williams doesn't recall the number of times she has checked Crews in the above systems. Williams stated *"at some point I did find out that he (Crews) had a criminal history yes or that he was developing a criminal history yes."* Williams said that she recalls that Crews was involved in a shoplifting complaint at Sears and had discussed him being caught carrying a gun. When asked if she noted Crew's criminal progression she stated *"probably but it's not something that would stick in my mind as what happened when.*

- Robert Crews has further given Williams a series of gifts, including; a purse (Dooney and Burke), card, flowers and stuffed animals (Hello Kitty Doll and a teddy bear). Williams does not recall the time frame of which she received the gifts but stated "this was the beginning when I first met him." Williams talked to Crews on additional times immediately after the purported seizure but their discussions did not concern the seizure of drugs or guns. When asked if Williams retrieved a copy of the respective police report in IIQ or RMS, Williams stated *"probably at some point yeah."* Williams said that she lectured Crews about the incident even though he was not her confidential informant at the time. At no time did Williams communicate with the Special Operations Division that she had a good rapport with Crews.

- Williams concedes that Robert Crews has a criminal past. Whereas Williams asserts that she has no knowledge that Crews is presently involved with crime. Williams confirms that she has checked Crews in LEIN periodically before 2006.

Williams cannot remember checking Crews in LEIN during the proximate times that he loaned her $300 - $350. Williams defined the term confidential informant in the following manner, "*somebody that is giving you information that you don't want to share their name with other people because they are giving you information that you know is helpful to me for my job and also you know people might retaliation on them for giving that information.*"

- Ofc. Williams stated in Jury Trial that Crews was a CI. She never mentioned this until the trial and never registered him. In addition she took money and gifts from a know felon who she classified as a CI.

- However, at the time of the Workman interview (March 3, 2010) Williams explained that she had recently reconnected with Robert Crews at a local bar. Williams exclaimed "*I guess kind of where I come from I don't judge people necessarily and I should and I understand that I'm not supposed to because of my job hang around people that are involved in criminal activity.*" Williams argued that she talks with Crews on a weekly basis and considers him "*a nice kid*" and a "*sweetheart*".

- Williams did state that she had talked with Crews' several days prior to her IA interview and now terms Crews as an "*acquaintance maybe.*" Since the start of Williams' administrative leave on April 7, 2010 she has continued her telephone communications with Crews

- Williams reports that she possibly checked Crews in LEIN the first time that she had contact with him and is sure that he did not have warrants. Williams further states that she periodically checked Crews in LEIN in order to see if he was actively involved in criminality. On multiply times Williams ascertained that Crews had active warrants, however she failed to arrest him. Williams explained that she was often not in contact with Crews when he had warrants. Workman cited to Williams "*you know that you probably shouldn't be doing that right*" and Williams replied "*yes.*" Williams guessed that she had checked Crews at least **thirty (30) times** in LEIN.

- Williams further guessed that she had checked her husband, Eric Williams an unknown amount of times, **possibly ten (10) times**. Williams stated an affirmative yes that she had checked Robert Crews in LEIN more times than her husband.

- Williams was on duty when she checked Eric Williams in LEIN. Williams reasoned that she checked Eric In LEIN for the following reasons, "*I do remember there was a couple of times where I had called him (Eric Williams) and he didn't answer the phone so I ran him to get his driver's license number to put on my not necessarily AFLAC paperwork but something like that or whatever that I was filling out.*" Williams further stated that she checked Eric in LEIN to see his driving status. Williams was on duty when she checked Eric Williams in LEIN. Williams acknowledged that her husband Eric Williams no longer smokes

4

marijuana but has in the past.  Williams cited that Eric has not smoked marijuana since approximately 1-2 years since she started working for the Lansing Police Department. Williams reported that the marijuana that MSP found on Eric during his traffic arrest was a baggie of marijuana that he had did not remember was in his motorcycle jacket.

- It is noted that Eric Williams has received numerous traffic citations throughout the years and is a convicted Felon. Williams said that she checked Eric after a Michigan State Police arrest of which marijuana was located on him. When Workman asked Williams if she knew that she should not check her husband in LEIN Williams stated *"and it's one of those things I can't justify it, I'm not excusing it."* Williams concluded that she never acknowledged to Eric that she had checked him in LEIN.

- Williams ascertained that she checked her father, Harold Wallace in LEIN *"just to see you know if he's been in and out of trouble."*  Williams believes that she may have checked her father in LEIN about **four (4) times**. Williams checked him in LEIN to see if he had valid driver's license.  Williams argued that she was attempting to have her father placed into a rehabilitation center. Williams contends that her father has since moved to New Jersey approximately one (1) before this interview.  Workman noted that Williams' father had been arrested in New Jersey in 2008 which was the same proximate time of which Williams had checked him in LEIN on that occasion.

- Williams does not remember when she started checking her father in LEIN. Williams continued to check Wallace in LEIN throughout 2007 and 2008. Williams reasoned that her father was quit mobile and she just wanted to know if he was suspended or had a warrant as he continued to do drugs.  Williams admitted that her investigation of Wallace may be a conflict of interest

- On January 13, 2008 MSP Trooper Ben Seal contacted LPD to report a possible report of criminal misconduct by off-duty Ofc. Williams. Trooper Seal reported that he had contacted Officer Lorien Williams with Criminal Probationer (felon) Ivory Smalley on I-94 near exit 4 in New Buffalo Township Michigan (near the Michigan Indiana border). Trooper Seal explained that Smalley was charged with a 1 count felony of commercializing sex by the Grand Rapids Police Department on September 13, 2004.  As a result of the charge, Smalley pled guilty to felony criminal enterprises racketeering, see attached criminal history.  Smalley was on probation for criminal enterprises racketeering of which the primary charge was criminalizing sex.  Trooper Seal suspected that drugs may have been in the vehicle as Officer Williams identified herself as a Lansing Police Department (hereafter referred to as LPD) Police Officer. Williams told Trooper Seal that she was returning from a weekend trip to Chicago and that Smalley was providing her with a ride back to Michigan.  Trooper Seal felt deeply suspicious of Smalley and Williams but did not have enough probable cause for a search of the vehicle. Trooper Seal noted that Williams provided several inconsistent statements when questioned if Smalley had went to Chicago with her. The driver of the vehicle

5

Smalley argued that he had not left the state of Michigan. Trooper Seal contacted LPD reference his reservations.

- Williams described a trip she took with felon Ivory Smalley during the weekend of January 13, 2008. Williams planned a trip to Chicago to meet best friend, Brittney Richards in Chicago for her birthday. Brittney resides in Arizona but agreed to meet Williams and several others in Chicago to celebrate her birthday. Brittney was Ivory Smalley's friend and Williams does not remember meeting him years ago when she attended one of four High Schools in Grand Rapids, Michigan. Williams met Smalley at an office in Grand Rapids Michigan on 28th St. Williams agreed to ride with Smalley to Chicago for the weekend and pay half of the gasoline costs. Williams planned to return to work upon leaving Chicago. However, Brittney's flight was delayed. Because Williams wanted to spend more time with Brittney she called LPD command to explain would be late waiting for Brittney's flight to depart. Sometime later Smalley and Williams took Brittney to the airport and started the drive back to Grand Rapids.

- While en route to Grand Rapids, Smalley was stopped for a speeding violation by the Michigan State Police just across the Indiana/Michigan border. Williams identifies herself as a LPD officer who was in possession of her duty firearm. During initial contact with Michigan State Police Trooper Seal, Smalley told an untruth when telling Trooper Seal that he had not left the state of Michigan. Williams recognized that Smalley's statement was a complete fabrication.

- However, Williams said that she feared she would not have a ride to Grand Rapids and **she went along with what Smalley fabricated.** Williams stated, **"I went along with what he said, because he's my ride home."** Williams explained that Smalley said that he was on probation for computer fraud. **Williams provided Trooper Seal with a false statement when she said Smalley never left the state of Michigan and picked her up from a welcome center on the state line of Michigan. *Williams was adamant that she was unsure if she would not lie again to the Trooper if placed in a similar incident. It was clear that Williams has no regrets from this experience.***

- Williams complained that she was offended by the Trooper when he suggested that drugs might be in the vehicle. Williams stated the following, *"I just really didn't feel like him (Smalley) being on probation for a computer crime was a big deal for us to be for the officer to make a big deal and I felt offended at the time that he was implying that we would be moving drugs back and forth. I still feel offended by it and that's basically why I said I didn't want to get into it."* **When asked to reflect back on her untruth to the Trooper Williams concluded *"would I be honest about it and just say that Jason (Smalley) was with us that weekend, I just don't know."***

6

- When asked if Williams checked Smalley in LEIN she stated *"possibly I don't know."* Williams again reported that her reasoning for checking Smalley in LEIN was motivated by "curiosity." Williams would later recall that she remembered from the LEIN response that Smalley was on probation for a computer crime. **Williams checked Smalley in LEIN three (3) times on January 15, 2008 according to Lead Detention Officer Brian Kelley. This LEIN use was not included in the MSP warrant request reference the City of Lansing v Lorien Williams.**

- As a result of the above and per LPD 300-24, Outside Investigations, LPD contacted the Michigan State Police to investigate Officer Williams' association with criminals and other forms of possible criminal misconduct. The MSP investigation remained open for two years and no criminal drug trafficking charges were formulated reference Williams. In September 2009 MSP Detective Sergeant Worked shifted her investigation to include LEIN unauthorized disclosure. On March 3, 2010 Sergeant Workman interviewed Officer Lorien Williams at District 1 Headquarters, where Williams admitted she lied to the MSP trooper, by stating *"I went along with what he said, because he's my ride home."*

- January 15, 2008 Williams checked Smalley in LEIN (3) times upon her return to work

- March 3, 2010 MSP Sgt. Workman conducts criminal interview of Williams as at which time Williams accepts accountability for misuse of LEIN during MSP interview.

- March 23, 2010 Sergeant Workman's investigation found that Williams had inappropriately used LEIN to check her husband, Eric Williams, acquaintance, Robert Crews, and her father Harold Wallace Sr.

- March 24, 2010 Williams uses Officer Erk's LEIN terminal and checks Sydney Brown. Williams used the computer in Officer Brent Erk's patrol vehicle to check Brown's license plate in LEIN.

- Williams maintains that Brown has requested for her to check him in LEIN once. When asked if she checked him in LEIN, William replies *"well I never ran him in that way."*

- Williams articulates that she went to her apartment in Holt Michigan one night while on duty. Williams then observed a vehicle that appeared out of place near her home. Williams said that she did not know the vehicle belonged to Brown when making a decision to check it in LEIN. Williams then returned to Lansing and contacted Officer Erk sometime later. Williams said she was *"curious,"* when she ran the plate. Williams would later find out that the vehicle in question belonged to Brown. Williams stated *"my car the computer wasn't working that*

7

*night and I ran it in somebody else's car."* Williams communicated that her computer was not working to Officer Erk and he agreed to allow her to run the license plate. Williams did not tell Erk that the license plate in question was from a vehicle parked near her apartment in Holt Michigan or that it belonged to Sidney Brown.

- Williams' comments that once she learned the plate in question belonged to Sidney Brown she called and asked him. Sgt. Fabus questioned Williams if she checked Brown, Williams cited the following, *"No I didn't because he wanted me to run him out of Illinois and I can't say if I would or wouldn't have ran him but I don't know how to run people out of state."* Williams argued that she did not tell Brown she would not check him in LEIN but merely said that she did not know how to use LEIN to check people out of state. Williams did explain that she did not intentionally check Brown in LEIN

- It is noted that Williams completed the LEIN check on March 24, 2010 which was three (3) weeks after her interview with MSP Sergeant Workman. Williams is unsure what was not working on her computer. Williams further does not recall how she contacted Erk in order to meet with him and use his computer.

- On March 29, 2010 Ingham County Deputies contacted Officer Lorien Williams with parolee Sydney Brown at her apartment in Holt during a domestic disturbance. Williams' husband, Eric Williams arrived at the residence and a verbal argument ensued. Deputies arrived on scene and contacted the parties involved. Responding Deputies reported that Brown (now Ofc. Williams boyfriend) was in possession of small quantity of Marijuana at the scene.

- In regards to felon Sidney Brown, Williams confirms that she is presently in a dating relationship with him. Williams acknowledged that Brown is on parole for armed robbery and she has transported him to a scheduled parole reporting once. In fact, Williams has taken Brown to at least one scheduled parole visit. Williams further substantiated that she is aware that Brown has recently violated the conditions of his parole on at least once occasion.

- Williams said she found out early in the relationship that Brown was on parole. Williams further declared that she is aware that Brown has violated his parole since their relationship started. Williams has visited Brown's family in his hometown of Chicago once during a one day trip for a family barbecue

- Brown acknowledged that he had requested for Williams to check him in LEIN. However, Brown did not believe that Williams would grant his request. Brown continued that Williams explained that she was unable check him in Illinois however he had a "good license" in Michigan. Brown said that he only desired to know if he had a valid license in Illinois. Brown laughed when asked if he paid Williams to check him in LEIN, he argued that Williams was his *"woman."* Brown

8

also noted that he spends considerable amounts of time with Williams. Brown stated that he was at Williams' Holt, Michigan apartment on May 11, 2010.

- The investigation produced a four (4) count misdemeanor warrant for LEIN Violations. April 7, 2010 ICPO warrant authorized for LEIN violations reference Williams. The warrant cited that Williams had engaged in unauthorized disclosure of LEIN on 12/27/08 (Eric Williams), 11/12/07, 11/17/08 and 11/10/08 (Harold Wallace), and 7/20/09 (Robert Crews).

- For an unknown reason, Williams was NOT charged for Smalley or Sidney Brown.

- October 8, 2010 Officer Williams guilty of (1) count of LEIN violation (Husband) The trial was handled in District 54A Court and Officer Williams was found guilty of one (1) count of LEIN Violation. Williams received a $100 fine and $250 in court costs as a result of her conviction.

- October 12, 2010 MSP prohibits Williams from permanent direct access to LEIN

- On Oct.12[th] of 2010, Chief Szymanski received a letter from the MSP Criminal Justice Information Center of the Michigan State Police. The letter reported that because of Officer Williams October 7, 2010 conviction of LEIN violation she was henceforth permanently prohibited from having direct access to LEIN. The letter explained that LPD should delete all system interfaces concerning Williams' sign-on or password.

- Liz Canfield the LEIN violations investigator stated that the above prohibition will follow Officer Williams throughout the State of Michigan. Canfield requested a copy of this report, notification of any disciplinary actions taken and any departmental policy revisions as a result of the investigation.

### Additional Aggravating Factors-

- Williams has been married to Eric Williams since 2002. Ofc. L. Williams explained that she is still married and lives with husband ,Eric Williams has a criminal records for drugs,)

- Williams was questioned concerning her knowledge of reputed drug trafficker Marlin Beard. Williams reported that her husband, Eric and Beard grew up together and she said they were possibly cousins? Beard has been over to the Williams' residence on at least two times while attending barbecues she hosted (before 2004).

- Williams agreed that Beard was heavily involved in criminality.

- Williams said that her husband has never asked her to check Beard in LEIN. However, LEIN archive reports illustrate that Williams' checked Marlin Beard in LEIN on July 25, 2007. Williams confirmed that she was not involved in any investigation regarding Beard and has had no direct police contact with Beard. Williams explained her reasoning for checking Beard in LEIN, *"I don't know I was just curious. I'm not disputing that I didn't run him. I don't recall running him in LEIN but I wouldn't say that I didn't. You guys said that I did, I just don't know why."*

- August 11, 2008  SOS proffer with LEE,  admits smoking marijuana at Williams' house

- Williams was queried about her investigation of LPD police incident LLA070704047654.  This incident involved a felonious assault which occurred on July 4, 2007 at 2312 E. Michigan Ave.  Williams responded to the scene and learned that a felonious assault had occurred and that a subject known as "Big Mike" was one of two accused. Williams' investigation cited that "Big Mike" was the girlfriend of Olivia McAbee. Williams noted that Olivia McAbee and her friend / confidential informant, Robert Crews may have had a dating relationship. Williams has never questioned Olivia McAbee about her relationship with Robert Crews. Williams also acknowledged that she had responded to McAbee's house (rental owned by Detective Quincy Scroggins) on several occasions. Williams reported in her court testimony that she contacted confidential informant Robert Crews (she believes she contacted Crews the night of the shooting) who provided information that identified the legal name of Michael Pruitt (AKA Big Mike).  Michael Pruitt was Olivia McAbee's boyfriend at the time of this incident.

- Williams was questioned why she neglected to articulate in the above report that she received information from a confidential informant. Williams wrote in the above report that "Officer Erk advised that Olivia's boyfriend's name is Michael Pruitt."  Williams said that she did not put in the report that a confidential informant assisted with the identification of Michael Pruitt. Williams argued that did not wish to put Robert Crews' name in the report but would use the term "confidential informant" in the report if allowed to repeat this investigation. Williams attempted to explain that she was able to confirm Erk's information with Crews' intelligence about "Big Mike."  The report states that Williams entered the above report on July 4, 2007 at 02:25 hrs which was approximately 2 hours after her response to the scene. However, Williams is unclear if she called Robert Crews on the date of this incident.

10

- Williams guesses that she may have other persons that she would consider a confidential informant and a friend. Williams does not periodically check others she considers friends and informants in LEIN. Williams continued she has not made a criminal case with information obtained Crews. Williams affirms that Crews gave her information regarding a person traveling with a handgun however she is unsure of the prosecutorial outcome of that intelligence. Williams did not simultaneously use information from Crews and accept gifts, nor did Williams seek advice how to manage her informant relationship with Crews.

- Williams complained that when interviewed by Workman she did not mention that Robert Crews was her confidential informant. Williams also stated that she would also never classify Crews as a confidential informant.

- In direct testimony, Williams sustained that she well aware of the LPD procedure manual and noted that there is nothing in the manual that distinguishes the personal and business use of LEIN. Williams explained that the bi-yearly LEIN recertification tests also fail to effectively define personal and business LEIN use.

- Williams contends that she still does not have a definition for personal LEIN use. However, she cites "*it's (LEIN use) has become the biggest headache in my life.*" Williams has a heightened level of apprehension concerning LEIN use and agreed that she would not check her husband Eric or Robert Crews.

- However, in reviewing Ofc. Williams yearly LEIN Recertification Tests the following was are test questions that Ofc. Williams answered:

❖ The attached LEIN Operator re-certification 2001 test demonstrates that "Officers may run criminal history checks for personal use, as long as they are on duty." Officer Williams checked the correct answer for this question which is a false. This test (November 21, 2001) was located in Officer Williams' LEIN training folder.

❖ The attached LEIN Operator re-certification test that Officer Williams completed on November 30, 2005 demonstrate in questions #20 and #21 the following that "LEIN/SOS information can now be given to a citizen over the telephone and misuse of LEIN/NCIC/SOS can now be given to a citizen over the telephone." Williams checked false that LEIN/SOS information can be given over the telephone. Williams further checked true that misuse of LEIN/NCIC/SOS may result in criminal penalties.

❖ Officer Williams argues in the interview that she does not recall completing the LEIN Re-certification test for February 3, 2010. The respective tests has Lori Williams listed as the name of the test, however, Williams is adamant that she did not take the assigned test. Nonetheless, Williams acknowledges that she did sign the LEIN user rules of behavior acknowledgement form which is dated February 24, 2010.

11

- Williams admitted in both her MSP Interview and IA interview that she was wrong to run Robert Crews, Eric Williams, Smalley, Harold Wallace Sr., and Sidney Brown in LEIN for personal use. However, during the trial she stated that Crews was a CI. However, she could not prove he was a CI and Crews never stated that he was a CI.

- **Summary of potential PROFFER for Quiten Lee**:
- Lee August 11, 2008 Interview:
  - Lee was interviewed by SOS Officers on August 11, 2008. Lee provided a substantive report of his involvement with very large amounts of cocaine purchases and sells throughout Lansing and Chicago.

  - Lee further mentioned that he purchased his home from Officer Lorien Williams' husband, Eric Williams. Lee further knew that Eric Williams' wife was a police officer. However he reported no knowledge of Officer Williams being involved in police corruption. Lee did state that he had attended a party over the Williams' house and smoked Marijuana with Eric Williams.

- Lee August 21, 2008 Interview :
  - Quint Lee was interviewed again on August 21, 2008 by SOS Officers. Lee again reiterated his history of narcotic trafficking in the City of Lansing. Lee provided a list of 16 persons that were involved in the narcotics trade. Lee mentioned that Marlon Beard was a confirmed drug dealer. Lee argued that Beard was connected with a network of dealers that purchased drugs in Chicago and transported them to the Lansing area. Lee provided again that he attended a pool party at the Williams house and "*everyone at the party was smoking Marijuana and drinking alcoholic beverages.*" Lee smoked Marijuana with Eric Williams and several other persons at the residence.

- **Crews Letter of Agreement with SOS, FBI, and Crews Attorney Hugh Clarke**
  In an interview dated, 8-15-2007, the interview was regarding Crews relationship with LPD Ofc. Lorien Williams and possible police misconduct. Crews expressed his relationship with Ofc. Williams, but he denied that he was paying her for police sensitive information.

- Officer Kris Doerr found it strange that Williams would be seen intoxicated at the Cadillac Club. This club is known for numerous criminal incidents and he did not understand why a LPD officer would affiliate themselves with the patrons and establishment. Doerr further recalls Williams' visits to another problem house at 2010 W Jolly Rd. When in Tri-County Metro Doerr recounts that this residence was notorious for drug complaints. The residence even had a drive by shooting. Doerr further stated that while transporting a prisoner from the Eaton County Jail a confidential subject stated that Williams was a corrupt police officer. The subject stated that Williams aware of her husband's involvement with drug

12

trafficking from Arizona and Chicago. Doerr reported incident to SOS Sergeant Del Kostanko for further investigation.

- Officer Brent Erk has been with LPD for 13 years and has worked primarily as a patrol officer with a stint as a K-9 Officer. Officer Erk was interviewed on July 28, 2010 in the Office of Internal Affairs. Erk was interviewed after he called this investigator to express some concerns he had about Officer Williams' use of LEIN. Erk reported that on April 7 or 8, 2010 he learned that Williams had been placed on administrative leave for violating LEIN rules. With this information, Erk believed that Williams had also inappropriately used his computer to check someone in LEIN.

- Ofc. Glynn Elton explains a telephone call she overheard Williams talking to her husband. Williams was *"getting license plates from her husband and running two or three license plates from her husband over the phone. And when I asked her what she was doing she told me that I said what are you doing, what's going on cause it took me a minute to realize it was her husband and she told me that oh she thought her husband thought a couple co-workers were suspended or something and wanted her to run them but I also recall that she also gave him LEIN information as in whether or not they had warrants. At that time I told her to stop it, don't ever do that again and I never rode with her again."* Glynn Elton did not mention this incident to anyone else. The incident occurred between 2003 and 2006.

- Erk explained that on March 24, 2010 he received a CAD message via the in car computer from Williams. Williams was working this date and asked if they could meet each other. Erk thought the meeting was to discuss a recent call of which both had responded. Upon the meeting, Erk at the time had no knowledge that Williams was being investigated for LEIN violations, if so Erk contends he would not have allowed Williams to use his computer. Williams and Erk contacted each other and she stated that her computer was not working. Williams asked if she could check a license plate on his computer. Erk said that periodically computers fail and he did not feel this was an unusual request. Erk further thought that Williams was further investigating their most recent dispatched call which the two were patrolling for the accused. Erk elaborated that he then exited the driver's side of his car and allowed Williams to enter. Williams then typed a plate under his Talon (LEIN) log in connection. Williams looked at the received information then deleted it off of his computer. Williams then returned to her car. Several days later Erk returned to work and used a sequence to recall the plate information that Williams checked in LEIN. Erk then noted that the vehicle of which Williams checked was a Pontiac and was registered to someone that lived in either Holland or Muskegon Heights, Michigan. Erk said that he had initially assumed Williams' request to use his computer was regarding their previous call. However, after reading the press release concerning Williams' arrest for LEIN violations he became suspicious and concerned. Erk feared that he would some how become involved with this incident and wanted to make sure that he immediately contacted Internal Affairs.

13

- Officer Erk was interviewed a second time reference the following complaint. Erk was questioned about is assistance in the investigation of a shooting complaint that occurred at 2312 E Michigan Ave, LPD incident #LLA070704047654.  Both Erk and Williams responded to the scene and deduced that a shooting had occurred and one of the accused was identified only as "Big Mike" who drives a dark colored SUV.    Erk said that he overhead Williams interviewing a witness and communicated that Olivia McAbee dates a larger statute male named Michael Pruitt who drives a dark colored Cadillac Escalade.  Erk continued that Williams never mentioned anything about her use a confidential informant to assist in the identification of Michael Pruitt.

- **Olivia McAbee's statement:**
    - McAbee identified a picture of Crews and stated that he was in a dating relationship with Officer Williams some years prior.  McAbee described an incident when she lived at 141 Shephard.  Williams was driving a fully marked patrol vehicle and contacted "Black Rob" who at the time was outside talking with Kemmer (presently in prison).  Williams was heard screaming at "Black Rob."  McAbee said that she then confirmed rumors that "Black Rob" was dating a female police officer. L. Williams.
    - On one late evening at approximately 0100 hrs, McAbee stated that she and several friends inside her residence were awakened by officers to come down stairs and open the door.  The same female officer she had seen earlier screaming at "Black Rob" was then inside as the front door had been left unlocked.  McAbee identified Officer Williams and stated that Williams began interrogating if she or any of the other females were dating "Black Rob."  McAbee believes this incident took place in 2006. McAbee said that she was scared during this incident and initially thought that someone was attempting to rob her.  Williams held McAbee against the wall and further took her cellular telephone.  Williams stated *"Black Rob is my man, how do you know him?  Why was he over here which one of you knows him?"*  McAbee complained that Williams was looking throughout her telephone numbers and asking who knows "Black Rob."
    - McAbee argues that there were many rumors that "Black Rob" had police protection from Williams.  Reportedly "Black Rob's" financial situation improved once he started dating Williams. When asked if anyone ever reported allegations that Williams was involved in corruption, McAbee stated "*No nobody is going to say anything.  I think I heard a couple people say she tells him where to go and where not to go and who to deal with and who not to deal with.  Her (Williams) name was ringing around in the streets for a long time.*"

14

## Final Summary Statement-

Williams has engaged in a lifestyle that is contradictory to the notion of policing. Williams has admittedly been untruthful to a Michigan law enforcement officer. Williams admitted that she accepted a $350 loan and other various gifts from drug dealer Robert Crews. Such behavior reflects unfavorably on the department as well as the violation of law. The fact that Williams was convicted of misuse of LEIN by a jury suggests that her actions have marred the department's reputation with its citizenry. The residents of Lansing and the profession of policing holds police officers to a higher standard of integrity and honesty. Williams' associations with multiple felons, parolees, reputed drug dealers that are actively involved in criminal activities paint a picture of impropriety and deviant behavior.

Williams under the guise of legitimate police work engaged in a hoax to perform a LEIN check of Sidney Brown. Williams deceived Officer Erk and was granted the use of his computer. This treatment of her fellow coworker demonstrated a negative sense of teamwork with other police officers. In fact, this investigation displayed the systemic notion that many patrol officers simply do not trust Officer Williams.

This investigation revealed a multitude of inconsistencies regarding Williams' explanations concerning this matter. However, the policy regarding untruthfulness is very narrow and suggests that during the entire Investigation and court proceeding, Ofc. Williams was not truthful. However, during her IA interview, it is unclear which is the truth is and which is not.

As stated below a conviction of the violation of any law shall be prima facie evidence of a violation of this section. Lack of a criminal complaint or an acquittal of a violation of law shall not preclude internal administrative disciplinary action. The criminal prosecution was only for one (1) criminal count, but investigation found that Williams was in violation of the LEIN rules more than just running her husband for his ops code.

The Internal Investigation sustained the following Rules of Conduct charges on Ofc. L. Williams:

**Count 1**     1.04 Conformance to Laws – **SUSTAINED**

A. Employees shall obey all laws of the United States and of any state and local jurisdiction in which the employees are present.

B. A conviction of the violation of any law shall be prima facie evidence of a violation of this section. Lack of a criminal complaint or an acquittal of a violation of law shall not preclude internal administrative disciplinary action.

15

**Count 2**     1.26 Associations – **SUSTAINED**

    A. Employees shall avoid regular or continuous associations or dealings with persons they know, or should know, are persons under criminal investigation or indictment, or who have a reputation in the community or the Department for present involvement in felonious or criminal behavior, except as necessary to the performance of official duties, or where unavoidable because of other personal relationships of the employee.

    B. Employees shall not knowingly join or participate in any organization that advocates, incites or supports criminal acts, criminal conspiracies, or hate crime activities.

**Count 3**     1.02 Unbecoming Conduct – **SUSTAINED**

Employees shall conduct themselves at all times in such a manner as not to discredit the Department. Unbecoming conduct shall include that which brings the Department into disrepute, or impairs the operation or efficiency of the Department.

**\*Note-**

**Mention of LEIN Violation by then Officer James Gill-**

It is true that that back in Dec. 1992, then Ofc. James Gill did have a sustain complaint for 1.04 Conformance of Laws (LEIN USE). The final disposition through the grievance process was a written reprimand. ***It should be noted that this was approximately 18 years ago, and the LEIN laws are stricter in 2010 than they were in 1992.*** (See IA92-0173 for further)

16